# EXHIBIT A



## The Department of Justice's Operation Fast and Furious: Accounts of ATF Agents

**JOINT STAFF REPORT**

Prepared for

Rep. Darrell E. Issa, Chairman
United States House of Representatives
Committee on Oversight and Government Reform
&
Senator Charles E. Grassley, Ranking Member
United States Senate
Committee on the Judiciary

112th Congress
June 14 2011

# Table of Contents

I.   Executive Summary ................................................................................. 4

II. Table of Names ..................................................................................... 7

III.   Findings ............................................................................................ 9

IV.   The ATF Policy on Gun Interdiction: "You Don't Get to Go Home" ................ 11

   A.   The Justification for Operation Fast and Furious ............................... 11

   B.   Trained to Interdict .................................................................... 14

V.   Gunwalking Defined: It's Semantics ...................................................... 18

VI.   Concerns about Gunwalking: "What the Hell is the Purpose of This?" ........... 21

   A.   Concerns Fall on Deaf Ears and Meet Resistance .............................. 21

   B.   Tragic, Yet Foreseeable Results ................................................... 24

   C.   Catastrophe Becomes Reality ...................................................... 28

VII.   Witnessing Gunwalking: "We Did Not Stop Them." ................................ 28

   A.   Watching Guns Walk ................................................................. 29

   B.   Ordered to Stand Down .............................................................. 30

   C.   "We Were Walking Guns. It was Our Decision." .............................. 34

VIII.   Collateral Damage: A Fast and Furious Inevitability ................................ 35

   A.   Increasing Volume Equals Increasing Success ................................. 35

   B.   "You Need to Scramble Some Eggs" ............................................. 38

   C.   An Inevitable and Horrible Outcome ............................................. 39

   D.   The Pucker Factor .................................................................... 41

IX.   The Tragic Death of U.S. Border Patrol Agent Brian Terry ....................... 43

X.   The Beginning of DOJ's Denials: "Hell, No!" ....................................... 46

XI.   DOJ's Continued Denials: "That is False." ........................................................ 49

   A.   "Of Course Not" ............................................................................................ 49

   B.   More Denials ................................................................................................. 51

XII.   Conclusion ............................................................................................................ 51

# I.    Executive Summary

In the fall of 2009, the Department of Justice (DOJ) developed a risky new strategy to combat gun trafficking along the Southwest Border. The new strategy directed federal law enforcement to shift its focus away from seizing firearms from criminals as soon as possible— and to focus instead on identifying members of trafficking networks. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) implemented that strategy using a reckless investigative technique that street agents call "gunwalking." ATF's Phoenix Field Division began allowing suspects to walk away with illegally purchased guns. The purpose was to wait and watch, in the hope that law enforcement could identify other members of a trafficking network and build a large, complex conspiracy case.

This shift in strategy was known and authorized at the highest levels of the Justice Department. Through both the U.S. Attorney's Office in Arizona and "Main Justice," headquarters in Washington, D.C., the Department closely monitored and supervised the activities of the ATF. The Phoenix Field Division established a Gun Trafficking group, called Group VII, to focus on firearms trafficking. Group VII initially began using the new gunwalking tactics in one of its investigations to further the Department's strategy. The case was soon renamed "Operation Fast and Furious," and expanded dramatically. It received approval for Organized Crime Drug Enforcement Task Force (OCDETF) funding on January 26, 2010. ATF led a strike force comprised of agents from ATF, Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), Immigration and Customs Enforcement (ICE), and the Internal Revenue Service (IRS). The operation's goal was to establish a nexus between straw purchasers of assault-style weapons in the United States and Mexican drug-trafficking organizations (DTOs) operating on both sides of the United States-Mexico border. Straw purchasers are individuals who are legally entitled to purchase firearms for themselves, but who unlawfully purchase weapons with the intent to transfer them into the hands of DTOs or other criminals.

Operation Fast and Furious was a response to increasing violence fostered by the DTOs in Mexico and their increasing need to purchase ever-growing numbers of more powerful weapons in the U.S. An integral component of Fast and Furious was to work with gun shop merchants, or "Federal Firearms Licensees" (FFLs) to track known straw purchasers through the unique serial number of each firearm sold. ATF agents entered the serial numbers of the weapons purchased into the agency's Suspect Gun Database. These weapons bought by the straw purchasers included AK-47 variants, Barrett .50 caliber sniper rifles, .38 caliber revolvers, and the FN Five-seveN.

During Fast and Furious, ATF frequently monitored actual transactions between the FFLs and straw purchasers. After the purchases, ATF sometimes conducted surveillance of these weapons with assistance from local police departments. Such surveillance included following the vehicles of the straw purchasers. Frequently, the straw purchasers transferred the weapons they bought to stash houses. In other instances, they transferred the weapons to third parties. The volume, frequency, and circumstances of these transactions clearly established reasonable

suspicion to stop and question the buyers. Agents are trained to use such interactions to develop probable cause to arrest the suspect or otherwise interdict the weapons and deter future illegal purchases. Operation Fast and Furious sought instead to *allow* the flow of guns from straw purchasers to the third parties. Instead of trying to interdict the weapons, ATF purposely avoided contact with known straw purchasers or curtailed surveillance, allowing guns to fall into the hands of criminals and bandits on both sides of the border.

Though many line agents objected vociferously, ATF and DOJ leadership continued to prevent them from making every effort to interdict illegally purchased firearms. Instead, leadership's focus was on trying to identify additional conspirators, as directed by the Department's strategy for combating Mexican Drug Cartels. ATF and DOJ leadership were interested in seeing where these guns would ultimately end up. They hoped to establish a connection between the local straw buyers in Arizona and the Mexico-based DTOs. By entering serial numbers from suspicious transactions into the Suspect Gun Database, ATF would be quickly notified as each one was later recovered at crime scenes and traced, either in the United States or in Mexico.

The Department's leadership allowed the ATF to implement this flawed strategy, fully aware of what was taking place on the ground. The U.S. Attorney's Office for the District of Arizona encouraged and supported every single facet of Fast and Furious. Main Justice was involved in providing support and approving various aspects of the Operation, including wiretap applications that would necessarily include painstakingly detailed descriptions of what ATF knew about the straw buyers it was monitoring.

This hapless plan allowed the guns in question to disappear out of the agency's view. As a result, this chain of events inevitably placed the guns in the hands of violent criminals. ATF would only see these guns again after they turned up at a crime scene. Tragically, many of these recoveries involved loss of life. While leadership at ATF and DOJ no doubt regard these deaths as tragic, the deaths were a clearly foreseeable result of the strategy. Both line agents and gun dealers who cooperated with the ATF repeatedly expressed concerns about that risk, but ATF supervisors did not heed those warnings. Instead, they told agents to follow orders because this was sanctioned from above. They told gun dealers not to worry because they would make sure the guns didn't fall into the wrong hands.

Unfortunately, ATF never achieved the laudable goal of dismantling a drug cartel. In fact, ATF never even got close. After months and months of investigative work, Fast and Furious resulted only in indictments of 20 straw purchasers. Those indictments came only after the death of U.S. Border Patrol Agent Brian Terry. The indictments, filed January 19, 2011, focus mainly on what is known as "lying and buying." Lying and buying involves a straw purchaser falsely filling out ATF Form 4473, which is to be completed truthfully in order to legally acquire a firearm. Even worse, ATF knew most of the indicted straw purchasers to be straw purchasers *before Fast and Furious even began.*

In response to criticism, ATF and DOJ leadership denied allegations that gunwalking occurred in Fast and Furious by adopting an overly narrow definition of the term. They argue that gunwalking is limited to cases in which ATF itself supplied the guns directly. As field

agents understood the term, however, gunwalking includes situations in which ATF had contemporaneous knowledge of illegal gun purchases and purposely decided not to attempt any interdiction.  The agents also described situations in which ATF facilitated or approved transactions to known straw buyers.  Both situations are even more disturbing in light of the ATF's certain knowledge that weapons previously purchased by the same straw buyers had been trafficked into Mexico and may have reached the DTOs.  When the full parameters of this program became clear to the agents assigned to Group VII, a rift formed among Group VII's agents in Phoenix.  Several agents blew the whistle on this reckless operation only to face punishment and retaliation from ATF leadership.  Sadly, only the tragic murder of Border Patrol Agent Brian Terry provided the necessary impetus for DOJ and ATF leadership to finally indict the straw buyers whose regular purchases they had monitored for 14 months.  Even then, it was not until after whistleblowers later reported the issue to Congress that the Justice Department finally issued a policy directive that prohibited gunwalking.

This report is the first in a series regarding Operation Fast and Furious.  Possible future reports and hearings will likely focus on the actions of the United States Attorney's Office for the District of Arizona, the decisions faced by gun shop owners (FFLs) as a result of ATF's actions, and the remarkably ill-fated decisions made by Justice Department officials in Washington, especially within the Criminal Division and the Office of the Deputy Attorney General.  This first installment focuses on ATF's misguided approach of letting guns walk.  The report describes the agents' outrage about the use of gunwalking as an investigative technique and the continued denials and stonewalling by DOJ and ATF leadership.  It provides some answers as to what went wrong with Operation Fast and Furious.  Further questions for key ATF and DOJ decision makers remain unanswered.  For example, what leadership failures within the Department of Justice allowed this program to thrive?  Who will be held accountable and when?

## II. Table of Names

### John Dodson
*Special Agent, ATF Phoenix Field Division*

Agent Dodson is the original whistleblower who exposed Operation Fast and Furious.  A seven-year veteran of ATF, Dodson also worked in the sheriff's offices in Loudoun County and other Virginia municipalities for 12 years.  Agent Dodson was removed from Phoenix Group VII in the summer of 2010 for complaining to ATF supervisors about the dangerous tactics used in Operation Fast and Furious.

### Brian Terry
*U.S. Border Patrol Agent*

Brian Terry was an agent with the U.S. Border Patrol's Search, Trauma, and Rescue team, known as BORSTAR.  He served in the military and was a Border Patrol agent for three years.  On December 14, 2010, during a routine patrol, Terry was confronted by armed bandits.  He was shot once and killed.  Two weapons found at the scene traced back to Operation Fast and Furious.

### Jaime Avila
*Straw Purchaser*

Jaime Avila was the straw purchaser who bought the two AK-47 variant weapons that were found at the murder scene of Brian Terry.  Avila bought the weapons on January 16, 2010.  ATF, however, began conducting surveillance of Avila as early as November 25, 2009.  On January 19, 2011, Avila was indicted on three counts of "lying and buying" for weapons purchased in January, April, and June 2010.

### David Voth
*Phoenix Group VII Supervisor*

Agent Voth was the former supervisor of the Phoenix Group VII, which conducted Operation Fast and Furious.  As Group VII Supervisor, Voth controlled many operational aspects of Fast and Furious.  Voth is no longer in Phoenix.

### Pete Forcelli
*Group Supervisor, ATF Phoenix Field Division*

Since 2007, Agent Forcelli has been the Group Supervisor for Phoenix Group I.  Before Phoenix Group VII was formed in October 2009, Group I was the primary southwest border firearms group.  Before joining ATF in 2001, Agent Forcelli worked for twelve years in the New York City Police Department as a police officer and detective.

**Olindo Casa**
*Special Agent, ATF Phoenix Field Division*

Agent Casa served in Phoenix Group VII during Operation Fast and Furious.  Agent Casa is an 18-year veteran of ATF, having worked in Chicago, California, and Florida.  In Chicago, Agent Casa worked on numerous firearms trafficking cases, including a joint international case.  Agent Casa had never seen a gun walk until he arrived at Group VII in Phoenix and participated in Operation Fast and Furious.

**William Newell**
*Special Agent in Charge, ATF Phoenix Field Division*

Agent Newell was the former head of the ATF Phoenix Field Division during Operation Fast and Furious.  Newell is no longer in Phoenix.

**Emory Hurley**
*Assistant U.S. Attorney, District of Arizona*

Emory Hurley is the lead prosecutor for Operation Fast and Furious. Hurley advised the ATF Phoenix Field Division on the Operation, including instructing agents when they were and were not able to interdict weapons.

**Larry Alt**
*Special Agent, ATF Phoenix Field Division*

Agent Alt served in Phoenix Group VII during Operation Fast and Furious. An 11-year veteran of ATF, Agent Alt worked as a police officer for five years before joining ATF.  Agent Alt is also a lawyer, having served as deputy county attorney in Maricopa County, a county of nearly 4 million people that encompasses the Phoenix metro area.

## III.   Findings

➢  DOJ and ATF inappropriately and recklessly relied on a 20-year old ATF Order to allow guns to walk.  DOJ and ATF knew from an early date that guns were being trafficked to the DTOs.

➢  ATF agents are trained to "follow the gun" and interdict weapons whenever possible. Operation Fast and Furious required agents to abandon this training.

➢  DOJ relies on a narrow, untenable definition of gunwalking to claim that guns were never walked during Operation Fast and Furious.  Agents disagree with this definition, acknowledging that hundreds or possibly thousands of guns were in fact walked.  DOJ's misplaced reliance on this definition does not change the fact that it knew that ATF could have interdicted thousands of guns that were being trafficked to Mexico, yet chose to do nothing.

➢  ATF agents complained about the strategy of allowing guns to walk in Operation Fast and Furious.  Leadership ignored their concerns.  Instead, supervisors told the agents to "get with the program" because senior ATF officials had sanctioned the operation.

➢  Agents knew that given the large numbers of weapons being trafficked to Mexico, tragic results were a near certainty.

➢  Agents expected to interdict weapons, yet were told to stand down and "just surveil." Agents therefore did not act.  They watched straw purchasers buy hundreds of weapons illegally and transfer those weapons to unknown third parties and stash houses.

➢  Operation Fast and Furious contributed to the increasing violence and deaths in Mexico. This result was regarded with giddy optimism by ATF supervisors hoping that guns recovered at crime scenes in Mexico would provide the nexus to straw purchasers in Phoenix.

➢  Every time a law enforcement official in Arizona was assaulted or shot by a firearm, ATF agents in Group VII had great anxiety that guns used to perpetrate the crimes may trace back to Operation Fast and Furious.

➢  Jaime Avila was entered as a suspect in the investigation by ATF on November 25, 2009, after purchasing weapons alongside Uriel Patino, who had been identified as a suspect in October 2009.  Over the next month and a half, Avila purchased 13 more weapons, each recorded by the ATF in its database within days of the purchase.  Then on January 16, 2010, Avila purchased three AK-47 style rifles, two of which ended up being found at the murder scene of U.S. Border Patrol Agent Brian Terry.  The death of Border Agent Brian Terry was likely a preventable tragedy.

➢ Phoenix ATF Special Agent in Charge (SAC) William Newell's statement that the indictments represent the take-down of a firearms trafficking ring from top to bottom, and his statement that ATF never allowed guns to walk are incredible, false, and a source of much frustration to the agents.

➢ Despite mounting evidence to the contrary, DOJ continues to deny that Operation Fast and Furious was ill-conceived and had deadly consequences.

# IV.   The ATF Policy on Gun Interdiction: "You Don't Get to Go Home"

ATF's long-standing policy has been not to knowingly allow guns to "walk" into the hands of criminals.  Yet DOJ and ATF used a 1989 ATF order to help justify allowing straw purchasers allegedly connected to Mexican drug cartels to illegally buy more than 1,800 weapons during Operation Fast and Furious.  While this Order permits agents—at their discretion—to allow the illegal transfer of firearms to further an investigation, it does not go so far as to permit them to pull surveillance completely and allow the guns to walk.

## A.   The Justification for Operation Fast and Furious

FINDING:   **DOJ and ATF inappropriately and recklessly relied on a 20-year old ATF Order to allow guns to walk.  DOJ and ATF knew from an early date that guns were being trafficked to the DTOs.**

Released on February 8, 1989, ATF Order 3310.4(b) explains ATF's Firearms Enforcement Program.  The Department of Justice and ATF relied on this Order to defend Operation Fast and Furious.  ATF leadership in Phoenix believed a specific clause within the Order, section 148(a)(2), justified Operation Fast and Furious and its policy to allow guns to walk.  The clause reads as follows:

148. "WEAPONS TRANSFERS"

a. Considerations. During the course of illegal firearms trafficking investigations, special agents may become aware of, observe, or encounter situations where an individual(s) will take delivery of firearms, or transfer firearm(s) to others. In these instances, the special agent may exercise the following options:

* * *

(2) In other cases, *immediate intervention* may not be needed or desirable, and the special agent may choose to allow the transfer of firearms to take place in order to further an investigation and allow for the identification of additional coconspirators who would have continued to operate and illegally traffic firearms in the future, potentially producing more armed crime.[1]

---

[1] BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES ORDER 3310.4(b) 148(a)(2) (Feb. 8, 1989) (emphasis added).

ATF's reliance on this section of the Order is misguided.  The phrase "*immediate intervention* may not be needed or desirable" does not justify a complete lack of intervention with regard to thousands of weapons illegally purchased by straw buyers allegedly linked to drug cartels.  ATF cited this Order in an early briefing paper that contained the following paragraph:

> Currently our strategy is to **allow the transfer of firearms to continue to take place**, albeit at a much slower pace, in order to further the investigation and allow for the identification of co-conspirators who would continue to operate and **illegally traffic firearms to Mexican DTOs** which are perpetrating armed violence along the Southwest Border.  This is all in compliance with ATF 3310.4(b) 148(a)(2).  It should be noted that since early December efforts to "slow down" the pace of these firearms purchases have succeeded and will continue **but not to the detriment of the larger goal of the investigation.**  It should also be noted that the pace of firearms procurement by this straw purchasing group from late September to early December, 2009 defied the "normal" pace of procurement by other firearms trafficking groups investigated by this and other field divisions.  This "blitz" was extremely out of the ordinary and created a situation where measures had to be enacted in order to slow this pace down in order to perfect a criminal case.[2]

This statement leaves little doubt that ATF felt Operation Fast and Furious was compliant with existing ATF policy.  Further, it shows that DOJ and ATF knew from an early date that the firearms were being illegally trafficked to Mexican drug cartels.

Although senior ATF management cited the Order as justification for Fast and Furious, it did not pass muster with street agents.  They believed that it did not permit a total lack of intervention.  Agents believed they must interdict at some point if they have knowledge of an illegal firearms transfer.  Yet senior management used the Order to justify the notion that ATF would completely drop surveillance of the weapons and then wait until receiving trace requests when the weapons were eventually recovered at crime scenes.  Such traces would supposedly create a "nexus" between the drug cartels and the straw purchasers.  The agents, however, did not agree with any interpretation of the order that would be consistent with that kind of strategy.

As Special Agent John Dodson testified:

Q.      And just so we are clear on what your understanding of the order was, and we can all obtain it and read it and have our own understanding of it, but what were you taught about what that means?

A.      That that implies when the straw purchaser makes the purchase at the counter, you don't have to land on them right there at the counter or as soon as he walks out the door, that it is okay to allow it to happen, to allow him to go with that gun under your

---

[2] Briefing Paper, ATF Phoenix Field Division, Group VII (Jan. 8, 2010) (emphasis added).

surveillance to the ultimate purchaser of it or whom he is
delivering it to, or if he is taking it to a gang or a stash house or
whomever, it is okay to allow it to happen, to go there, to be
delivered. ***But you don't get to go home.*** You get the gun, is my
understanding, what I have been taught and how in every other
ATF office not only that I have been in but that I have gone like
TDY to work at that that policy is implemented.

Q.    So, in other words, your understanding is that there is a temporal or
time limitation on how long it can be allowed to continue on its
course without you intervening.

A.    I think it is not so much time as it is availability of eyes on. Like if
I get an agent that's on the house and we know that gun is on the
house, that's still okay . . . even if it is overnight, on to the next
night, the gun and bad guy are still there. We are just waiting on
the guy he is supposed to deliver it to to come by and pick it up.

Q.    Well, the beginning of it said in other cases immediate intervention
may not be needed or desirable.

A.    Correct.

Q.    So are you saying that, in other words, "intervention," that doesn't
mean, "no intervention ever?"

A.    Correct.

Q.    Just the intervention doesn't have to happen right now, ***but
intervention does need to occur***, that's your understanding?

A.    Yes, sir, that it is not as soon as the FFL hands the straw purchaser
the gun, that's it, you can't let him leave the store with it.

Q.    It is not a license to forego intervention at all?

A.    Correct.[3]

       During Operation Fast and Furious, however, ATF agents *did* go home. They did *not*
get the guns. ATF simply broke off surveillance of the weapons. Yet, as Agent Dodson explains
it, the Order used to justify that practice actually anticipates interdiction at some point. It does
not authorize what occurred under Fast and Furious:

---

[3] Transcribed Interview of ATF Special Agent John Dodson, Transcript at 121-123 (April 26, 2011) (on file with
author) [hereinafter Agent Dodson Transcript].

More so, that line that says the agent has the discretion to allow the purchaser not – or the purchase to proceed or not, what it is trying to tell you is you don't have to effect the arrest or the interdiction right there in the store. It is telling you that you can allow it to happen until that guy leaves the store and meets with the person that he bought the gun for, then you can effect the arrest. **It is *not* telling you that you can watch this guy purchase *thousands of firearms over 18 months* and not do any follow-up on it.**[4]

## B.     *Trained to Interdict*

**FINDING**:     **ATF agents are trained to "follow the gun" and interdict weapons whenever possible. Operation Fast and Furious required agents to abandon this training.**

**Interdiction v. Prosecution:** Prior to their assignment with Operation Fast and Furious, ATF agents were trained to interdict guns and prevent criminals from obtaining them. Interdiction can be accomplished in many ways. While prosecutors focus on gathering proof "beyond a reasonable doubt" to be presented at trial, agents begin with a standard of "reasonable suspicion." If an agent can articulate a reasonable basis to suspect an illegal purchase, then the agent can take proactive steps to investigate, potentially develop probable cause to arrest, or prevent the illegal transfer of firearms some other way. From the agents' point of view, a prosecution isn't necessary in order to achieve the goal of preventing criminals from obtaining firearms. An arrest may not even be necessary. In fact, another portion of the ATF Order describes some of these other interdiction strategies:

   b.  Alternative Intervention Methods. In the event it is determined by the special agent that a weapons transfer should not take place, the special agent may consider ***alternative methods of intervention*** other than arrest and/or search warrants ***that will prevent the culmination of the weapons transfer but allow the investigation to continue undetected***. These alternative methods are considered to be a course of action that must be approved by the RAC/GS or SAC as previously noted. These alternative interventions may include, but are not limited to:

   (1)  A traffic stop (supported by probable cause to search or supported by a traffic violation allowing for plain view observations) by a State or local marked law enforcement vehicle that would culminate in the discovery and retention of the firearms. ***This would prevent the weapons transfer from fully occurring and may in turn produce new investigative leads***. Should the occupants of the vehicle be new/unknown participants in the organization under investigation, they may be fully identified

---

[4] Agent Dodson Transcript, at 84.

which in turn will yield additional information for follow-up investigation. Should the occupants of the vehicle be known participants in the investigation, requesting telephone tolls for these individuals (or if a Penn Register/T-III interception order is in use) for the period shortly after the traffic stop may show calls and yield identifying information relating to the intended receivers of the firearms.[5]

Three of the special agents assigned to this operation had more than 50 years of law enforcement experience. Throughout their careers, ATF always taught them to get the guns away from criminals. When they observed signs of suspicious transactions, agents looked for ways to prevent weapons from falling into the wrong hands. Agent Dodson testified:

> I can tell you this. We knew without a doubt at my old field division when someone had a case that said, hey, this guy is . . . supposed to be a straw and he is going to make this deal today, if he makes the deal, we were talking to them. I mean if we all left the office on an op for a suspected straw purchaser, that means we had, we suspected him of being a straw purchaser. Well, when he purchases, that adds to the suspicion. So he was getting talked to, either "knock and talk" or, depending on what happened or what he purchased might alter things and we might get to a higher level . . . that reasonable suspicion or probable cause. **But we were doing *something*. If nothing else we were putting him on notice that we were watching him, all right, and that every time he went to the gun store, we were going to be there with him, or the minute one of those guns turned up in a crime somewhere, we were coming back to talk to him**, or even better, or maybe not better, but some point down the road we might be back to knock on your door and ask you, still got those guns or are you selling without a license, you better have a receipt or something to go with them to prove your point.
>
> The bottom line, sir, whenever a walk situation with a gun occurred . . . ***nobody went home until we found it, until we got it back.*** There were no ifs, ands or buts, you didn't ask. Nobody said, "I got to make a soccer game," [or] "I have got to pick my dog up," nothing. Okay. If somebody said, "where is the gun," you knew it was an all-nighter until we found it.[6]

Fast and Furious employed the exact opposite practices. ATF agents rarely talked with straw purchasers, or conducted a "knock and talk." When guns recovered at crime scenes linked back to straw purchasers, ATF agents did not approach these straw purchasers. Agents did not

---

[5] BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES ORDER 3310.4(b) 148(b)(1) (Feb. 8, 1989) (emphasis added).

[6] Agent Dodson Transcript, at 60-61.

ask them why did they did not still possess guns they had recently sworn on a federal form were for their personal use. Instead, ATF agents stood by and watched for months as the straw purchasers bought hundreds upon hundreds of additional AK-47 variants and Barrett .50 caliber sniper rifles. ATF failed to conduct proper surveillance of the walked guns. ATF leadership in Phoenix cannot account for the location of the walked guns until they turn up at a crime scene, which may be *after* they have been used to kill or maim innocent victims on both sides of the border. Untold numbers of these weapons likely reached the DTOs in Mexico.

To the extent that these walked weapons reached the DTOs, it is a direct result of the policy decision to no longer focus on interdicting weapons as soon as possible. From the agents' perspective, that decision was the polar opposite of their understanding of the previous policy. For example, Special Agent Olindo Casa testified:

> Q.   And if you became aware that somebody purchased guns with the intent of transferring it to a third person, would it be your practice and experience to interdict those weapons *right away*?
>
> A.   Yes, yes.
>
> Q.   Is that your understanding of ATF policy?
>
> A.   Yes.[7]

However, under Fast and Furious in Phoenix, agents did not follow these methods. As Special Agent Lawrence Alt testified:

> Q.   [I]s it fair to say that if you saw a suspect, a suspicious person . . . leaving an FFL with . . . an armful of boxes that appeared to be AK-47s or like weapons, that in your experience as an agent, I mean, would you be able to interdict that?
>
> A.   That would be my normal course of action. I understand there is other strategies wherein you are trying to identify where those firearms are going to. So you might not interdict them until they are delivered, or if you have investigative measures in place to follow them, you might let them go to . . . what you believe is their ultimate destination.
>
> *But prior to my coming to Phoenix, Arizona, I had never witnessed a firearm not – I never witnessed a situation where there wasn't at least an attempt to interdict or take the firearm at some point.*

---

[7] Transcribed Interview of ATF Special Agent Olindo James Casa Transcript, at 18 (April 28, 2011) (on file with author) [hereinafter Agent CasaTranscript].

Q.      [Y]ou might allow the suspicious person to leave the FFL with a
        car full of weapons, you might make a decision not to do a traffic
        stop right then, but is it fair to say that you would want to follow
        that suspect?

A.      I have had experiences or been aware and involved either directly
        or indirectly in experiences where we knew there was illegal
        firearms purchases. *Follow the gun was also the motto, follow the
        gun, stay with the gun.*

        I am aware of a couple of instances in my past where people would
        sit on houses all night long, days on end, waiting for the guns to go
        so that they could then follow it, satisfy the requirements of the
        investigation. . . . But I have never been involved in a situation
        where you would simply not do anything.[8]

This changed when the Agent Alt arrived in Phoenix.

        Agent Casa recounted a similar situation.  He had also never heard of, nor seen, guns
being allowed to walk until he got to Phoenix:

                . . . . But from the time I started as an ATF special agent . . . up
                until the time I got to Phoenix, that was my understanding, that *we
                do not let guns walk, absolutely, positively not*.  And if we – if
                ever a case [where] we would do that, there better be a really good
                explanation why we did not grab that gun when we could.

Q.      But that changed when you came to Phoenix, I mean the practice at
        least changed, correct?

A.      Yes.

Q.      So that occurred while you were here?

A.      Yes.[9]

ATF policy is clear and unambiguous.  As Agent Casa further explained:

Q.      So could you – are you saying if you determine that somebody has
        acquired a firearm unlawfully –

A.      Correct.

---

[8] Transcribed Interview of ATF Special Agent Lawrence Alt, Transcript at 37-39 (April 27, 2011) (on file with
author) [hereinafter Agent Alt Transcript].
[9] Agent Casa Transcript, at 92.

Q.      – ATF's policies and procedures would be to interdict that weapon?

A.      Yes. Yes.[10]

Agent Dodson said it succinctly:

> So my training and experience with ATF as well as with law enforcement prior to then essentially is *you interdicted a gun whenever you could. Guns didn't go.*[11]

A third agent, Special Agent Peter Forcelli, spoke of the importance of interdicting these weapons:

Q.      Did you have any kind of policy regarding gun trafficking, in other words . . . was your policy to interdict guns whenever possible?

A.      Absolutely.[12]

Every single agent on every single prior assignment adhered to a policy to interdict weapons as soon as possible, until Fast and Furious.  As one agent put it, "It's like they grabbed the ATF rulebook and threw it out the window."[13]

# V.     Gunwalking Defined: It's Semantics

**FINDING:   DOJ relies on a narrow, untenable definition of gunwalking to claim that guns were never walked during Operation Fast and Furious. Agents disagree with this definition, acknowledging that hundreds or possibly thousands of guns were in fact walked.  DOJ's misplaced reliance on this definition does not change the fact that it knew that ATF could have interdicted thousands of guns that were being trafficked to Mexico, yet chose to do nothing.**

The Department of Justice has repeatedly and steadfastly denied that any guns were walked under Operation Fast and Furious.  According to the narrowest possible interpretation, a gun is walked only when an ATF agent physically places an AK-47 into the hands of a straw purchaser and then lets that straw purchaser walk out of sight.  Conversely, every single ATF field agent interviewed stated that guns are walked when ATF has the opportunity to interdict illegally purchased weapons, yet chooses not to even try.

---

[10] Agent Casa Transcript, at 17.
[11] Agent Dodson Transcript, at 19.
[12] Transcribed Interview of ATF Special Agent Peter Forcelli, Transcript, at 25 (April 28, 2011) (on file with author) [hereinafter Agent Forcelli Transcript].
[13] Telephone interview with ATF Special Agent A.

DOJ officials must have known that straw purchasers were buying guns illegally and transferring them to third parties for trafficking across the border.  This was clear, or at least should have been clear, from the following factors:

(1) the sheer volume and frequency of the purchases,

(2) ATF's and DOJ's communications with the cooperating gun dealers,

(3) the contemporaneous notice dealers provided about hundreds of transactions with straw purchasers, and

(4) notifications through the Suspect Gun Database that the firearms were being recovered in crime scenes in Mexico shortly after being purchased.

Yet, ATF failed to use this information to interdict future purchases and prevent guns from crossing the border.

Instead, ATF followed DOJ's new policy, and focused on simply trying to identify more and more members of the trafficking ring.  It was a conscious decision to systematically avoid interdicting guns that normally should have been interdicted, according to the agents.  Thus, the agents considered it to be gunwalking.  Agent Dodson testified:

> My understanding of letting something walk or defining walk is, when it was in or could have been in and quite possibly should have been in law enforcement custody, a decision is made, a conscious decision is made to not take it into custody or to release it.  Then it is walked. . . . [Y]ou are talking about walking dope, walking money, walking anything else.  To walk a firearm was never taught.  It was what we consider a no-brainer.[14]

As the agent explained, ATF did not teach agents to walk firearms as such a practice was beyond comprehension.  Agent Casa provided a similar understanding of gunwalking:

> Now, when I talk about walking guns, my understanding is that is when a person we suspect or have probable cause that a person illegally came across guns, whatever way they came across it, and we have knowledge of it and we are there and we do not interdict those guns, we do not take those guns, we do not do any warrantless seizure based on probable cause of those guns.  That would be my understanding of letting guns walk.[15]

Agent Forcelli defined gun walking as follows:

> . . . . If you can interdict it and you don't, in my opinion you have walked it.  There are times . . . we do a car stop, the person maybe

---

[14] Agent Dodson Transcript, at 18-19.
[15] Agent Casa Transcript, at 17.

> bought two guns, they would have a story that was reasonable. They had a pay stub . . . that indicated they had a salary or they had a – they can articulate why they bought it.  A couple times it happened.  Like I said, maybe twice they went on their way. Okay.
>
> But again . . . walking guns, in my opinion, is if you can stop it and you don't.  There are some whose definition is if ATF has the gun and gives it, then we are walking it.[16]

Agent Alt also acknowledged two definitions of gunwalking:

> So I call that the two versions of walking a gun.  There is, it is a semantics issue.  Some people will say that only the purest definition is walking a gun.  Some people won't acknowledge that the other version is walking a gun.  And I say potato, you say potato.  I believe it is, my assessment, they are the same.  That's it.[17]

Regardless of which definition one subscribes to, the two situations both warrant action. Still, DOJ and some senior ATF officials maintain that federal agents did not sanction or knowingly allow the transfer of firearms to straw purchasers.  Yet, the evidence demonstrates that DOJ and ATF *were well aware* of what was happening.

Phoenix Field Division leadership did not tolerate debate or dissent from agents over terminology or strategy.  Agent Dodson testified:

Q. I believe you mentioned that there was some dispute about exactly what gun walking meant.

* * *

And can you describe what the difference was, difference of opinion was?

A. Well, yes, sir. . . . Again, as I said earlier, my understanding of gun walking . . . has been something was and/or should have been, could have been in law enforcement custody.  When we should have done something and it wasn't, you have let it walk.

There has to be an active decision . . . a choice is made to allow it to walk.  It is not like something got away from you or you lost it. If a suspect beats you in a foot chase and he gets away, you didn't let him walk, you just lost the chase.  So that's what walking is.

---

[16] Agent Forcelli Transcript, at 33.
[17] Agent Alt Transcript, at 50.

> When [the Assistant Special Agent in Charge] came down to our
> office . . . we were told you don't know what walking is, we are
> not walking guns. And that's pretty much the extent of the debate,
> because in Phoenix there is very little debating one of the ASACs
> or the [Special Assistant in Charge]. So it was . . . a declaration,
> you don't know what walking guns is, we are not walking guns,
> this is all okay.[18]

Regardless of whether it meets a technical definition of gunwalking, the strategy was clearly ill-conceived. Instead of candidly acknowledging the facts and working to correct the problem, DOJ has withheld critical information from Congress and the public, obfuscating the issue.

## VI.   Concerns about Gunwalking: "What the Hell is the Purpose of This?"

ATF special agents in Group VII expressed many concerns about the strategies employed during Fast and Furious. None of the agents had ever before allowed a gun to "walk." None of the agents had even heard of allowing a gun to be "walked." The ATF academy does not teach agents to walk weapons, and the practice is abhorrent. Yet, in this operation, veteran ATF agents acted against their training and well-established ATF practice in allowing guns to walk right out of their sight. In spite of the agents' frustration and dismay, ATF leadership from Phoenix to Washington refused to acknowledge the validity of their concerns.

### A.   *Concerns Fall on Deaf Ears and Meet Resistance*

> **FINDING:**   **ATF agents complained about the strategy of allowing guns to walk in Operation Fast and Furious. Leadership ignored their concerns. Instead, supervisors told the agents to "get with the program" because senior ATF officials had sanctioned the operation.**

When agents learned that the tactics used in Fast and Furious required guns to be walked, many veteran special agents criticized and rebelled against the policy. These agents felt hamstrung, given that they could not use the training they had received throughout their careers. As Agent Dodson testified:

> Q.   Based on our training and experience, what did you think about
>        [walking guns]?
>
> A.   It was something I had never done before, sir. And quite frankly, I
>        took great issue with it and concern. I felt like I understand the

---

[18] Agent Dodson Transcript, at 90-92.

importance of going after the bigger target, but there is a way to do that. We did it successfully in the dope world all the time. And those skills and practices that we used there, a lot of them transfer over, and more than applicable in gun trafficking investigations, but we weren't allowed to use any of them.

Q.   And did you ever have a recollection of sharing your frustration with Special Agent Casa?

A.   Oh, yes, sir.

Q.   And any other special agents that you can –

A.   Yes, sir.

Q.   And maybe you could just tell us what other agents you –

A.   Pretty much everyone, sir. It was, I shared my reservations and concerns with Special Agent [L], with Dave Voth, with Special Agent [D] Special Agent [H], Special Agent [P], several of the special agents that came on the GRIT, G-R-I-T. The gunrunner initiative is what it stands for. I shared them with or I voiced my concerns to other agents inside the Phoenix field division that was on other groups.[19]

Agents felt compelled to speak up within days after joining Group VII. Agents complained to their superiors, to no avail. The agents, new to Phoenix, had to comply:

Q.   So the special agents in Group 7 objected to this amongst themselves. And at what point did feedback start to get communicated up the chain, whether it was to the case agent, Special Agent [L], or Group Supervisor Voth?

A.   Oh, it was *almost immediately* before we had . . . Special Agent Casa and I had taken it up with Special Agent [L], Special Agent [D], and as well as Group Supervisor Voth.[20]

Having launched an innovative strategic plan, ATF senior leadership at Phoenix was excited at the prospect of a new way of combating drug cartel activity. ATF and DOJ leadership both approved of this plan. As such, ATF Phoenix leadership were loathe to let disgruntled field agents scuttle their signature achievement. In this matter, a great divide developed between those who knew walking guns was a bad policy and vehemently spoke out against it, and those who believed walking guns was an effective policy.

---

[19] Agent Dodson Transcript, at 40-41.
[20] Agent Dodson Transcript, at 42.

A widely discussed e-mail from Group VII Supervisor David Voth best summarizes the divide that had emerged in Group VII, with senior special agents on one side, wanting to stop the operation, and those in the ATF chain of command on the other, wanting to continue the gun walking:[21]

> It has been brought to my attention that there may be a schism developing amongst the group. This is the time we all need to pull together not drift apart. We are all entitled to our respective (albeit different) opinions however we all need to get along and realize that we have a mission to accomplish.
>
> I am thrilled and proud that our Group is the first ATF Southwest Border Group in the country to be going up on wire. On that note I thank everyone for their efforts thus far and applaud the results we have achieved in a short amount of time.
>
> Whether you care or not people of rank and authority at HQ are paying close attention to this case and they also believe we (Phoenix Group VII) are doing what they envisioned the Southwest Border Groups doing. It may sound cheesy but we are "The tip of the ATF spear" when it comes to Southwest Border Firearms Trafficking.
>
> We need to resolve our issues at this meeting. I will be damned if this case is going to suffer due to petty arguing, rumors or other adolescent behavior.
>
> I don't know what all the issues are but we are all adults, we are all professionals, and we have an exciting opportunity to use the biggest tool in our law enforcement tool box. **If you don't think this is fun you're in the wrong line of work – period!** This is the pinnacle of domestic U.S. law enforcement techniques. After this the tool box is empty. Maybe the Maricopa County Jail is hiring detention officers and you can get paid $30,000 (instead of $100,000) to serve lunch to inmates all day.

Despite this e-mail, agents continued to experience dismay and frustration as Operation Fast and Furious continued along its perilous path. As Agent Casa testified:

Q.    And is it fair to say that . . . the folks on your side of the schism wanted to do everything they could to interdict these weapons so they wouldn't get any farther down the street than they have to?

A.    Yes, sir. We were all sick to death when we realized that – when we realized what was going on or when we saw what was going on by the trends. We were all just, yes, we were all distraught.[22]

The rift widened when the Assistant Special Agent in Charge (ASAC) authoritatively and unambiguously told Group VII that guns were not being walked, that the special agents were incorrect in their terminology, and that there would be no more discussion or dissension about this topic. Agent Dodson testified:

A.    Then we get an e-mail that . . . there is going to be a meeting. [the ASAC] is coming down, [the ASAC] comes into the Group 7 office and tells us essentially we better stand down with our complaints, that we didn't know what the definition of walking

---

[21] Email from Group VII Supervisor David Voth to Phoenix Group VII (Mar. 12, 2010).
[22] Agent Casa Transcript, at 41.

guns was, we weren't familiar with the Phoenix way of doing things, that *all of this was sanctioned* and we just needed to essentially shut up and get in line.  That's not a quote, but that's the feel of the meeting, so . . .

Q.     Do you remember approximately when that occurred?

A.     It was right after we went to the Group 7 building, so it had to be late February, early March 2010.[23]

Even some - outside Group VII - with reservations about the practice, indicated that they gave them the benefit of the doubt because the case was being supervised by the U.S. Attorney's office.  Agent Forcelli testified:

And I expressed concern . . . about that.  And I believe some of those guns were purchased historically.  It wasn't like 1200 were watched to go, but apparently they weren't interdicting either.  And his response was . . . if you or I were running the group . . . it wouldn't be going down that way and that **the U.S. Attorney is on board, and it was Mr. [Emory] Hurley, and *they say there is nothing illegal going on.*** [24]

## B.     *Tragic, Yet Foreseeable Results*

FINDING:     **Agents knew that given the large numbers of weapons being trafficked to Mexico, tragic results were a near certainty.**

Since Group VII agents were instructed not to interdict as early and as often as they believed they should, the agents quickly grasped the likelihood of tragic results.  Agent Alt testified:

Q.     At any point in time did you have communications that . . . this is going to end terribly, there is going to be deaths?

A.     I know that was talked about . . . the probability of a bad situation arises with the number each – as the number of firearms increases, meaning firearms that are out and outside of our control in this environment with this type of a case, which we are talking about a firearms trafficking case, southwest border firearm trafficking case, I only hope the case agent knows where they are going.  But they are out there and they are not accounted for by us, at least that I am aware of.  So there is certainly a greater probability and a greater liability.

[23] Agent Dodson Transcript, at 44.
[24] Agent Forcelli Transcript, at 36.

I can tell you that as early as June of last year I predicted to some of my peers in the office that we would be sitting right where we are today in this room.

Q.     Speaking with Congressional investigators?

A.     That this would be in front of a Congressional investigation.  And I was in agreement with Agent Dodson that someone was going to die.    And my observations in the office were there was an overwhelming concern, *even amongst those persons on the other side of the schism*, if I can use that term, that something bad was going to happen.

* * *

Q.     And is it fair to say that anxiety is heightened because of the possibility of some of these guns getting into the hands of criminals and being used against your fellow law enforcement agents?

A.     Yes.  And it is not even the possibility, because we know that they were procured unlawfully.  So if we know that from the beginning, they are already in the hands of criminals, so now we are simply dealing with what is the consequence of that.[25]

The most frustrating aspect of the gunwalking policy for the agents was that they believed they *could* have interdicted and stopped the guns from walking.

When agents arrived in Phoenix in December 2009, they believed there was *already* enough information to arrest the straw purchasers, try to flip them, and begin working up the chain with an eye toward "bigger fish" in the organization.  Yet, the fall of 2009 brought a remarkable departure from the normal practice of interdiction.  ATF's strategy explicitly stated that it would allow straw purchasers to buy weapons, and that's exactly what happened.  Agent Dodson testified:

Q.     With the new resources in Group 7 in the fall of '09 . . . you talked about some of the special agents that were joined, if all of you had interdicted the weapons as you saw them, what percentage do you think you could have prevented from sort of entering the stream . . . . if you read the press accounts of this, it is somewhere along the lines of 2,000 firearms have disappeared.  How many do you think you and your colleagues would have been successful to interdict?  Is it 10 percent, 50 percent?

---

[25] Agent Alt Transcript, at 120-122.

A.     Well, the question is kind implausible, sir. . . . When we hit the ground in Phoenix, say, and the original 40 straw purchasers were identified, and I can't remember if it is 240 or 270 guns that they knew at that point that these guys were responsible for, you take, you minus that 270 from the estimate of 2,000, and whatever you have left is what we could have prevented.

Because we should have landed on every one of those people the minute that we hit here. And the ones that we landed on that we couldn't make cases on, at least they would have been on notice that we were watching and they would have stopped buying, or every time they did, the flag went up and we could have been on them then.

And of all the ones that we didn't land on, several of them would have spoken to us, a couple of them even maybe would have worked for us as a confidential informant or sources, which is how you climb the ladder in an investigation into an organization. Sitting back and watching isn't it. Okay? If you are watching a TV show at that point of the wire, you are not doing your job. Your job is to get out here and make a difference. And we could have done it when we hit the ground. So what are we talking? ***1730, to answer your question***, is my opinion of how many of these firearms that we could have and should have prevented from ever being purchased by these individuals and subsequently trafficked to known criminals or cartel elements south of the border and elsewhere.

Q.     And is it fair to say if you started stopping these straw buyers as soon as they left [the gun dealers], is it fair to say that perhaps the drug trafficking organizations that they worked for would realize we got to get out of Phoenix, we have got to go to Dallas, we have got to go somewhere else, because Phoenix now has these new resources and they are catching us?

A.     Right, if not, come up with an entirely new alternative way to get their weapons. If we shut down the whole straw purchasing scenario here in Phoenix, or significantly hurt it to the point where it is not advantageous for them to do so, you figure, if they are paying $600 for an AK or AK variant, all right, for every one that they buy we are taking off ten of them, okay, that's, I mean in any business sense that's not a good idea. Ultimately you are paying $6600 for one AK at that point. Am I correct? [26]

---

[26] Agent Dodson Transcript, at 61-63.

Unfortunately, the agents' complaints fell on deaf ears.  As one ASAC noted, the policy and Operation had been sanctioned.  For many of the agents, the operation only fueled their outrage.  According to the agents, the operation failed to use their investigative strengths, honed over dozens of years in law enforcement.  Agents saw the whole operation as pointless, a poor way to operate, and above all, dangerous.  Agent Dodson testified:

> Q.    Can you be more specific about the instances in which you were told not to use those techniques?
>
> A.    Oh, certainly.  Well, every time we voiced concerns, every time we asked the question.  And this is so hard to convey because I understand you guys weren't there, you didn't live it.  But every day being out here watching a guy go into the same gun store buying another 15 or 20 AK-47s or variants or . . . five or ten Draco pistols or FN Five-seveNs . . . guys that don't have a job, and he is walking in here spending $27,000 for three Barrett .50 calibers at . . . walks in with his little bag going in there to buy it, and you are sitting there every day and you can't do anything, you have this conversation every day.
>
> You asked me . . . a specific time where you voiced where you want to do this.  Every day, all right?  It was like are we taking this guy?  No.  Why not?  Because it is not part of the plan, or it is not part of the case.  [Agent L] said no, Dave said no, [Agent E] said no. ***What are we doing here?  I don't know.  What the hell is the purpose of this?  I have no idea.***  This went on every day.[27]

DOJ and ATF determined that the goal of making the big case was worth the risk of letting hundreds and hundreds of guns go to criminals in the process.  This conclusion was unacceptable to the agents on the ground carrying out these direct orders.  The agents knew they were facilitating the sale of AK-47 variants to straw purchasers.  Supervisors ignored complaints and retaliated against agents who did complain by transferring them out of ATF Phoenix Group VII.  As Agent Dodson recalled:

> Q.    [A]t any point in time do you have a recollection of commiserating with your colleagues, whether it was Special Agent Casa, whether it was Special Agent Alt, or some of the other special agents that were on sort of your side of the schism, for lack of a better word?  Do you ever recall saying . . . good grief, if we had just snatched these guns at the FFLs we wouldn't even be in this situation?
>
> A.    Oh, yes, sir, and not only with people on my side of the schism.  I mean this was why I was, I mean I guess we will get to this later, but why I am no longer in Group 7, is because I addressed it with, or primarily with those on the other side of the schism.

---

[27] Agent Dodson Transcript, at 113.

* * *

Q.      And is it fair to say at this point you are outraged?

A.      Outraged and disgusted, however else you want to look at it.

Q.      And is it fair to say that part of your outrage is because . . . needless deaths are possibly occurring?

A.      Oh, very much so, sir.

Q.      That countless number of crimes are being perpetrated with these weapons that you and your colleagues may have facilitated –

A.      Yes. [28]

## C.      *Catastrophe Becomes Reality*

This agent's fear and outrage were realized by the death of Border Patrol Agent Brian Terry, a member of the U.S. Border Patrol Tactical Unit, as well as the almost certain deaths of countless Mexican citizens killed and the unknown amount of other crimes with weapons stemming from Fast and Furious. In Fast and Furious, ATF wanted to design a unique way to pursue the drug cartels. ATF and DOJ failed spectacularly to consider resulting negative outcomes. As Agent Dodson noted:

> Well, sir, if I may, and first of all, please everyone understand, I am not on either, or either side of this political spectrum, nor do I want to be. And quite frankly, it is unfathomable to me how both sides or any person isn't completely livid about what we have been doing here. **I cannot see anyone who has *one iota of concern for human life* being okay with this,** and being willing to make this go away or not hold the people that made these decisions accountable. I don't understand it. And again, none of you owe me an explanation, that's just my personal opinion.[29]

# VII.   Witnessing Gunwalking: "We Did Not Stop Them."

Fast and Furious required agents to stand down, ignoring their training and professional instincts. Allowing guns to fall into the hands of the DTOs was the Operation's central goal. Even when agents were able to interdict weapons, they received orders to stand down.

---

[28] Agent Dodson Transcript, at 57-58.
[29] Agent Dodson Transcript, at 101.

## A.   *Watching Guns Walk*

**FINDING:**   **Agents expected to interdict weapons, yet were told to stand down and "just surveil." Agents therefore did not act. They watched straw purchasers buy hundreds of weapons illegally and transfer those weapons to unknown third parties and stash houses.**

During their interviews, several agents offered detailed descriptions of their observations of suspected straw purchasers entering FFLs to purchase enormous quantities of assault rifles. Following orders, they did not intervene.  Agent Dodson remembered:

Q.   You got a guy that had purchased . . . ***40 different AKs*** **in the past two months** and . . . five or ten of them had already returned in time to crime.  **So I thought here we go, we are going to start interdicting people.**

We – they would go in and buy another five or ten AK variants or . . . five or ten FN Five-seveN pistols at a time, and come out.  We would see it.  We would know . . . that whatever standard of reasonable suspicion or probable cause was met, and we were landing on somebody before the end of the day.  **But that didn't happen.**

Q.   And that's something you realized how early in your fieldwork, first or second day?

A.   Oh, yes, sir.  I mean first or second day you are starting to question why aren't we doing this.  And then by the end of the week it was . . . frustration already as to how many guns have we watched these guys get away with.

Q.   In your first week, can you make an estimate of how many guns you saw get loaded into a vehicle and driven away?  I mean, are we talking like 30 or one?

A.   Probably 30 or 50.  It wasn't five.  There were five at a time. These guys didn't go to the FFLs unless it was five or more.  And the only exceptions to that are sometimes the Draco, which were the AK variant pistols, or the FN Five-seveN pistols, because a lot of FFLs just didn't have . . . 10 or 20 of those on hand.[30]

---

[30] Agent Dodson Transcript, at 33-34.

Witnessing, but not contacting, straw purchasers buying weapons from FFLs became common practice for Group VII field agents in Phoenix.  Agents sometimes conducted minimal surveillance following the purchases.  Sometimes they conducted no surveillance.  As Agent Dodson testified:

> We witnessed one of the individuals . . . the known straw purchasers arrive, go in.  Sometimes one of us would actually be inside the FFL behind the counter.  Sometimes if we had enough lead way we would go to the suspect's house and follow him from there to the FFL, or to a meeting . . . just prior to and see an exchange.[31]

Typically, agents ended surveillance of both the guns and the straw purchasers.  Agent Alt testified:

> Watched and/or was aware – I shouldn't say watched – was aware that purchasers were routinely making purchases . . . at least in one case suspects who were known to be purchasing for other people were buying firearms with funds that were known to come from other people.  And those firearms were not interdicted.  Those firearms often went to a house or a place, and then surveillance was terminated there.  So the disposition of the particular firearm may or may not have been known.

Q.    And did that happen frequently?

A.    Yes.[32]

## B.    *Ordered to Stand Down*

Superiors specifically ordered field agents to "stand down" despite establishing probable cause that a straw purchase had occurred.  Agent Casa testified:

Q.    And you were instructed or under orders from the case agent and group supervisor to do what, to do nothing?

A.    Well, when I would call out on surveillance, yes, I was advised do not – I would ask do we want to do a traffic stop, do we want to – I will throw another definition, you guys have probably heard this.  I am sorry, guys.  I don't know what you heard or didn't.  It is called "rip."  It is a slang for saying we are going to do a warrantless seizure of those firearms once we establish probable cause.

---

[31] Agent Dodson Transcript, at 39.
[32] Agent Alt Transcript, at 50.

Yeah . . . one of those days I called the case agent on the Nextel, said, hey . . . our straw purchaser, one of our targets has transferred the guns, he is driving south. This unknown person that just got delivered the firearms probably . . . all intents and purposes gave the straw purchaser the money to buy the guns had all the guns and he is going north. Hey, why don't we go ahead and stop that vehicle, rip the guns, and you can do what you want, we can arrest them. We don't have to arrest them. But we will grab the guns. And they said no. And I said this person is an unknown person. Well, you got the license plate. Well, it can be, that car could be registered to anybody, we don't know who that person is, let's at least do a vehicle stop so we can ID the person so maybe later we could get the guns back. ***No, just surveil.***[33]

Agent Forcelli recounts that situation from a different point of view:

Well, as I said, there was that GRIT, people at command. And there was an instance where an agent was yelling over the radio. . . . There were a bunch of people milling around. And we heard an agent that sounded like he was in distress.

And what happened was he was attempting to do a car stop. And we heard a female agent . . . telling him to stand down and not do the car stop. I later found out there were guns in the car and that the agent felt distressed because they had made him on the surveillance. So to let the guns go, it doesn't make any sense to me if you are burned.

Q.    Do you know who the agent was?

A.    Yes. It was Agent Casa.

Q.    And so you specifically yourself heard him on the radio saying something to the effect I want to go get these guns now?

A.    Yeah. And again, the reason, being a cop for so long you hear so many things on the radio, but you always can tell when somebody is in distress by the tone of their voice. As a cop you start racing to the scene before you actually hear the call. This was a similar instance, where you can tell by the tone of his voice something wasn't right.

Later on I spoke with him. And he said that a car had almost come at him. That's how aggressive they had become during the surveillance. And that's why he was so excited on the radio. But

---

[33] Agent Casa Transcript, at 41-43.

he was told to not stop the car with the guns in it, which to me makes no sense.[34]

Agent Dodson described the situation:

> I remember one time specifically we had been following this individual for so long to so many places that day . . . money pickups, gun drops, FFLs, and he got into an area of the city and he just started doing crazy [Ivans] . . . [like] unexplainable U-turns. He is doing heat runs, trying to burn surveillance, whatever cliché you want to use.
>
> So we knew we were made. Okay? We are made. He knows we are following. He knows we have been following him for awhile and we haven't done anything. We have to do something. I mean you have to do – we have to pull him over. We have to interact with him at some point. If not, he is always going to wonder, well, why are you following me. At least, for no other reason than a ruse, pull him over because . . . he did that illegal U-turn and whatever we need.
>
> We did it when I worked dope all the time. If they made surveillance, what did you do? Hey, there's an armed robbery back there, you guys match the description. No, you are not them. All right, later. And then we don't heat them up too bad. We weren't allowed to do that, not even for a ruse situation. **I mean there is a verbal screaming match over the radio about how . . . *what are you talking about*? There is no better time or reason to pull this guy over than right now.**

> Q.     So, in other words, whatever arguments might have been made before with regard to the specific instance that you are referring to about the utility of letting them continue their operations without knowing that you are onto them so that you can then follow and see where it goes, all those arguments go away at the point they made the fact they are being surveilled, right?

> A.     Correct.[35]

Unfortunately, ordering special agents to "stand down" when they planned to interdict guns became the norm. As Agent Dodson testified:

> Q.     Can you recollect a time when you were conducting surveillance on an FFL and you saw firearms being loaded into a car when you

---

[34] Agent Forcelli Transcript, at 60-62.
[35] Agent Dodson Transcript, at 116-117.

said to your colleague we got to go, we got to go seize this now, I understand the direction we have been given, but this is bad stuff, these are bad people, we need to go just –

A.   Yes, sir.

Q.   And did you ever do that?

A.   No, sir.  We were, at the time, one of the incidents that I recall specifically, Special Agent [D] was in the wire room at the time. We had been directed by both case agent and group supervisor that absent both of them, she is in charge.  When we were communicating the interdiction that we were going to make over the radio, she, monitoring the radio traffic in the wire room, came back over and ordered us to stand down.

I debated this with her, probably far more lengthy than I should have over the radio, and again ultimately was just ordered to stand down.  There were actually more than one of these discussions with her and Group Supervisor Voth, as well as with Special Agent [L], when *I thought we had a duty to act, that that was nonfeasance on our part by not doing so*.  And each time I was . . . told to stand down and somewhat reprimanded afterwards for voicing it.[36]

Other agents had similar experiences in being told to stand down.  Agent Casa remembered:

And a situation would arise where a known individual, a suspected straw purchaser, purchased firearms and immediately transferred them or shortly after, not immediately, shortly after they had transferred them to an unknown male.  And at that point I asked the case agent to, if we can intervene and seize those firearms, and I was told no.[37]

These were not isolated incidents.  Group VII members discussed, debated, and lamented walking guns on a daily basis, but the practice continued.  Agent Casa testified:

Q.   And what did you observe during your surveillance?

A.   [I] observed suspected straw purchasers go to area federal firearms licensees, FFLs, go into the store, walk out with a large number of weapons, get into a vehicle, drive off.[38]

---

[36] Agent Dodson Transcript, at 45-46.
[37] Agent Casa Transcript, at 33.
[38] Agent Casa Transcript, at 29.

## C.    *"We Were Walking Guns.  It was Our Decision."*

As all of the accounts from numerous ATF agents demonstrate, ATF intentionally and knowingly walked guns.  One of the ASACs in Phoenix reported that this policy was "sanctioned."  To allow these guns to be bought and transferred illegally was a conscious and deliberate decision, not merely by failing to take action to interdict, but also by giving the green light to gun dealers to sell to known straw purchasers.  By sanctioning the purchases even after dealers expressed concerns, ATF agents said they were actually facilitating the transactions:

Q.    And essentially you witnessed guns walk; that was not consistent with your training and experience?

A.    Sir . . . by the very definition of allowing them to walk, if I witnessed guns walk, that means it is another agency's operations. If I go help another agency and this is their op, then I witnessed guns walk.

**We were walking guns.  It was our decision.**  We had the information.  **We had the duty and the responsibility to act, and we didn't do so.**  So it was us walking those guns.  We didn't watch them walk, we walked.[39]

Agent Dodson later explains the consequences:

Q.    That countless number of crimes are being perpetrated with these weapons that you and your colleagues may have facilitated --

A.    Yes.

Q.    -- moving into the hands of the bad guys?

A.    Yes, sir.  **I would argue that it wasn't a "may have facilitated." It *was facilitated*.**  These FFLs wouldn't have made these purchases.  I mean they addressed their concerns to, I mean to ATF both formally as well as to us when we were inside getting copies of the forms, that this whole –

The genesis of this case was when they were calling in these people that they knew.  **This guy comes in, buys 10, 15, 20 AKs or . . . a 22-year-old girl walks in and dumps $10,000 on . . . AK-47s in a day, when she is driving a beat up car that doesn't have enough metal to hold hubcaps on it.  *They knew what was***

---

[39] Agent Dodson Transcript, at 41.

*going on.*  The "may have facilitated" to me is kind of erroneous. We did facilitate it.  How are we not responsible for the ultimate outcome of these [g]uns?[40]

# VIII. Collateral Damage: A Fast and Furious Inevitability

An increase of crimes and deaths in Mexico caused an increase in the recovery of weapons at crime scenes.  When these weapons traced back through the Suspect Gun Database to weapons that were walked under Fast and Furious, supervisors in Phoenix were giddy at the success of their operation.

## A.    *Increasing Volume Equals Increasing Success*

> **FINDING:**    **Operation Fast and Furious contributed to the increasing violence and deaths in Mexico.  This result was regarded with giddy optimism by ATF supervisors hoping that guns recovered at crime scenes in Mexico would provide the nexus to straw purchasers in Phoenix.**

Since ATF supervisors regarded violence and deaths in Mexico as inevitable collateral damage, they were not overly concerned about this effect of the Operation.  Quite the opposite, they viewed the appearance of Fast and Furious guns at Mexican crime scenes with *satisfaction*, because such appearances proved the connection between straw purchasers under surveillance and the DTOs.  For example, Group VII Supervisor David Voth eagerly reported how many weapons their "subjects" purchased and the immense caliber of some of these guns during the month of March alone:

---

[40] Agent Dodson Transcript, at 59.

| From: | Voth, David J. |
|---|---|
| Sent: | Friday, April 02, 2010 10:31 AM |
| To: | ████████████████ |
| Cc: | Phoe-Group VII |
| Subject: | No pressure but perhaps an increased sense of urgency... |

## MEXICO STATS

958 killed in March 2010 (Most violent month since 2005)

937 killed in January 2010

842 killed in December 2009

## SINALOA - MARCH STATISTICS

187 murders in March, including 11 policemen

I hope this e-mail is well received in that it is not intended to imply anything other than that the violence in Mexico is severe and without being dramatic we have a sense of urgency with regards to this investigation. Our subjects purchased 359 firearms during the month of March alone, to include numerous Barrett .50 caliber rifles. I believe we are righteous in our plan to dismantle this entire organization and to rush in to arrest any one person without taking in to account the entire scope of the conspiracy would be ill advised to the overall good of the mission. I acknowledge that we are all in agreement that to do so properly requires patience and planning. In the event however that there is anything we can do to facilitate a timely response or turnaround by others we should communicate our sense of urgency with regard to this matter.

Thanks for everyone's continued support in this endeavor,

David Voth
Group Supervisor
Phoenix Group VII

The agents within Group VII described Voth's reaction to all this gun violence in Mexico as "giddy."[41] In addition to this e-mail, private conversations they had with Voth gave them the impression that Voth was excited about guns at Mexican crime scenes subsequently traced back to Fast and Furious. Agent Dodson explains:

> Q.   Then there is an e-mail that was on CBS news that I made notes about written on April 2, 2010 by Group Supervisor Voth?
>
> A.   Yes, sir.
>
> Q.   And he reported that our subjects purchased 359 firearms during March alone.
>
> A.   Yes, sir.
>
> Q.   That there were 958 people killed in March of 2010.

---

[41] Agent Dodson Transcript, at 118.

A.    Yes, sir.

Q.    And he was . . . he was essentially trumpeting up the violence that was occurring as a result of an ATF sanctioned program, is that correct?

A.    Agent or Group Supervisor Voth took that, or the way that he presented that to us was look here, this is proof that we are working a cartel, the guns that our guys are buying that we are looking at are being found, are coming back with very short time to crime rates in Mexico in known cartel related violence, and the violence is going through the roof down there, we are onto a good thing here.

Q.    The e-mail further goes on and says there was 937 killed in January 2010, 842 killed in December, 2009.  The numbers are increasing?

A.    Yes, sir.[42]

This evidence established a nexus between straw purchasers in the United States and the DTOs in Mexico, bringing ATF one step closer to catching the "bigger fish."  This strategy of letting the "little fish" go in order to capture the "bigger fish" was the ultimate goal of Phoenix Group VII.  As Agent Dodson explained:

Q.    Okay.  So earlier we were discussing an e-mail that . . . was describing from Mr. Voth where he appears to present the crimes in Mexico.  You said something to the effect that he was, he was presenting the guns being recovered in Mexico as proof that you were watching the right people.

A.    Correct.

Q.    And that the increasing levels of violence were proof you were on the right track, essentially.

        I just wanted to clarify.  Is that, when you were saying those things, was that your reading of his e-mail, or do you recall other conversations that you had with him outside of the e-mail that . . . this was evidence that you were on the right track?

A.    Well, both.  I get that impression from reading his e-mail, but perhaps I get that impression because of knowing him how well I did.

---

[42] Agent Dodson Transcript, at 56-57.

> There were several instances.  Whenever he would get a trace
> report back . . . *he was jovial, if not, not giddy, but just delighted*
> *about that, hey, 20 of our guns were recovered with 350 pounds*
> *of dope in Mexico last night.  And it was exciting.*  To them it
> proved the nexus to the drug cartels.  It validated that . . . we were
> really working the cartel case here.[43]

Agent Alt described in great detail his disgust at the self-satisfaction of ATF leadership for sending guns into what they knew to be a war zone.  He also expounded on his view that the Group Supervisor should have been more concerned with those deaths in Mexico rather than with motivating his team.  He testified:

> Why then do we stand by and try to motivate agents to do
> something more to stem the homicides . . . with no further mention
> on the homicides and correlate that with the number of guns
> recovered in Mexico in a given month, when we should be saying
> how many of those guns left this state that we knew about in
> relationship to our cases in conjunction with these murders?  That
> didn't happen.[44]

## B.   *"You Need to Scramble Some Eggs"*

According to the ATF agents, their supervisors in Phoenix were sometimes shockingly insensitive to the possibility the policy could lead to loss of life.  Agent Dodson explained:

> Q.     [S]omebody in management . . . used the terminology "scramble
> some eggs."
>
> A.     Yes, sir.
>
> Q.     If you are going to make an omelette you have got to scramble
> some eggs.  Do you remember the context of that?
>
> A.     Yes, sir.  It was – there was a prevailing attitude amongst the group
> and outside of the group in the ATF chain of command, and that
> was the attitude. . . . I had heard that . . . sentiment from Special
> Agent [E] Special Agent [L], and Special Agent Voth.  And the
> time referenced in the interview was, I want to say, in May as the
> GRIT team or gunrunner initiative team was coming out.  I was
> having a conversation with Special Agent [L] about the case in
> which the conversation ended with me asking her are you prepared
> to go to a border agent's funeral over this or a Cochise County

---

[43] Agent Dodson Transcript, at 117-118.
[44] Agent Alt Transcript, at 174.

deputy's over this, because that's going to happen. And the sentiment that was given back to me by both her, the group supervisor, was that . . . if you are going to make an omelette, you need to scramble some eggs.[45]

## C.    An Inevitable and Horrible Outcome

The increasing number of deaths along with the increasing number of Fast and Furious guns found at Mexican crime scenes evoked a very different reaction among the line agents. They had great anxiety about the killings across the border. Their concern focused on reports of shootings and assaults of law enforcement officials. They worried openly of the consequences of walked weapons used to shoot a police officer.

This worst-case scenario came to fruition when United States Border Patrol Agent Brian Terry was murdered and two "walked" AK-47 rifles were found at the scene of the murder. Agent Forcelli described the mood following the Terry murder:

Q.    Do you recall any specific conversations that you had about after, after learning that . . . two of the guns at the scene had been traced back to the Fast and Furious case?

A.    [T]here was kind of a thing like deja vu, hey, we have been saying this was going to happen. The agents were pretty livid and saying exactly that. We knew. How many people were saying this was going to happen a long time before it did happen?

And then there was a sense like every other time, *even with Ms. Giffords' shooting*, **there was a state of panic**, like, oh, God, let's hope this is not a weapon from that case. And the shooting of Mr. [Zapata] down in Mexico, I know that, again, that state of panic that they had, like please let this not come back.

This was an embarrassment . . . that this happened to the agent, tragic. I mean my heart goes out to this family. I lost colleagues, and I couldn't imagine the pain they were going through. And it made it painful for us, even those not involved in the case, to think ATF now has this stain.[46]

Agent Alt explained the process by which ATF learned that weapons were being trafficked into Mexico.

Q.    But how would you identify that they ended up in Mexico?

[45] Agent Dodson Transcript, at 135-136.
[46] Agent Forcelli Transcript, at 127-128.

A.   Well, there is a variety of ways. One . . . you would identify where
they are going by virtue of recoveries that are happening in crimes
or interdictions. . . . So you identify that they are going south. And
I think then the strategy, if I understand it, is that the firearms are
then, once . . . they are going south, you try and follow them and
figure out where they are going and to who they are going to tie to
a greater organization and more people, identify the hierarchy of
the organization. That's the strategy.

And I don't know how you perfect a case doing that when you
don't have the guns. . . . But the strategy to me would have to be
that there has got to be some measure of accounting or follow-up
as to where they end up.[47]

The notion that these guns moved into Mexico and aided the drug war distressed the ATF
field agents, including Agent Casa:

Q.   It was a likely consequence of the policy of walking guns that
some of those guns would wind up at crime scenes in Mexico?

A.   Yeah.

Q.   And is it fair to say that some, if not many, of these crime scenes
would be where people would be seriously injured or possibly
killed?

A.   Of course.

Q.   **So is it a fair, predictable outcome of the policy that there
would be essentially collateral damage in terms of human
lives?**

A.   **Sure.[48]**

Agent Casa also emphasized that those who planned and approved Operation Fast and
Furious could have predicted the ensuing collateral violence:

I feel for the family of Agent Terry, I feel for his death. . . . I don't know
how some of the people I work with could not see this was going to be an
inevitable outcome, something like this happening. And I don't know
why they don't think that six months from now this won't happen again,
or a year from now, a year and a half from now.

---

[47] Agent Alt Transcript, at 160-161.
[48] Agent Casa Transcript, at 126-127.

But I don't know the exact number of guns that were put out into the streets as a result of this investigation.  But they are not going to disintegrate once they are used once.  They are going to keep popping up over and over and over.[49]

## D.   *The Pucker Factor*

> **FINDING:**    **Every time a law enforcement official in Arizona was assaulted or shot by a firearm, ATF agents in Group VII had great anxiety that guns used to perpetrate the crimes may trace back to Operation Fast and Furious.**

The design defect of Fast and Furious was its failure to include sufficient safeguards to keep track of thousands of heavy-duty weapons sold to straw purchasers for the DTOs.  ATF agents did not maintain surveillance of either the guns or the straw purchasers.  The guns were therefore lost.  The next time law enforcement would encounter those guns was at crime scenes in Mexico and in the United States.  However, because ATF had contemporaneous notice of the sales from the gun dealers and entered the serial numbers into the Suspect Gun Database, agents were notified whenever a trace request was submitted for one of those walked guns.  As Agent Alt testified:

> Q.    [A] little bit earlier you talked about a level of anxiety, the anxiety among the agents, perhaps even the supervisors, relating to weapons that are found at crime scenes.  There was a death, there is a murder scene in Mexico.  There is a trace that comes in of some kind, and the weapon is then connected to a weapon that may have been one of the weapons that were walked. . . . Is that accurate?

> A.    **Yes.  I used the word anxiety.  The term I used amongst my peers is pucker factor.**

> * * *

> Q.    Pucker factor, precisely.  But that's what it is relating to?  I am saying that correctly, right?

> A.    Yes.

> Q.    And this pucker factor, in your view, is related to a gun showing up at a crime scene, right, a murder scene, someone gets killed, et cetera?

---

[49] Agent Casa Transcript, at 127-128.

A.      Absolutely.

Q.      [B]ut isn't that crime scene also the reason or the place that permits
        us to trace the gun?  In other words, once the gun is walked, let's
        say it walks south, isn't the only other information we are ever
        going to get about that gun, isn't that going to come from a crime
        scene?

A.      Most likely, unless we have some resource in place down there,
        whether it be an informant or an undercover or an agent or
        something telling us where those guns end up.

                                    * * *

Q.      **So assuming for a second that that does not exist because we
        don't have any evidence to speak of, the only way we are going
        to see this firearm that was let go --**

A.      **Is a crime recovery.**

Q.      Crime gun recovery --

A.      That's correct.

Q.       -- which would be either in the pocket of a person caught for some
        other offense or very likely at a shooting?

A.      Most of the Mexican recoveries are related to an act of violence.

                                    * * *

Q.      But so typically the recovery will have evolved around a serious
        injury or gun related?

A.       Or about drug related.

Q.      But someone is either dead or hurt or both or something
        frequently?

A.      Yes . . . there is a lot of violence, and guns are recovered with
        respect to the violence.  A lot of your big seizures of the guns,
        though, the big seizures of the guns, mass is usually in conjunction
        of seizures of other things.

                                    * * *

My opinion is the last portion of your statement is spot on, you have to accept that there is going to be collateral damage with regard to that strategy. **You can't allow thousands of guns to go south of the border without an expectation that they are going to be recovered eventually in crimes and people are going to die.**[50]

## IX.    The Tragic Death of U.S. Border Patrol Agent Brian Terry

> **FINDING:**   **Jaime Avila was entered as a suspect in the investigation by ATF on November 25, 2009, after purchasing weapons alongside Uriel Patino, who had been identified as a suspect in October 2009.  Over the next month and a half, Avila purchased 13 more weapons, each recorded by the ATF in its database within days of the purchase.  Then on January 16, 2010, Avila purchased three AK-47 style rifles, two of which ended up being found at the murder scene of U.S. Border Patrol Agent Brian Terry.  The death of Border Agent Brian Terry was likely a preventable tragedy.**

Fast and Furious has claimed the life of an American federal agent.  Late in the evening of December 14, 2010, Border Patrol Agent Brian Terry, a native of Michigan, was on patrol with three other agents in Peck Canyon, near Rio Rico, Arizona.  One of the agents spotted a group of five suspected illegal aliens; at least two were carrying rifles.  Although one of the border patrol agents identified the group as federal agents, the suspected aliens did not drop their weapons.  At least one of the suspected aliens fired at the agents, who returned fire.  Agent Terry was struck by on bullet that proved to be fatal.[51]

Most of the suspected aliens fled the scene, though one of them, Manual Osorio-Arellanes, had been wounded and was unable to flee.  A slew of federal agents from a variety of agencies arrived at the scene and the authorities' recovered three weapons from the suspects, who had dropped their rifles in order to flee the scene faster.  Two of those recovered weapons were AK-47 variant rifles that had been bought on January 16, 2010 by straw purchaser Jaime Avila during Operation Fast and Furious.  Avila was entered as a suspect in the investigation by ATF on November 25, 2009.  This occurred after he purchased weapons with Uriel Patino, a straw buyer who had previously been identified as a suspect in October 2009.  On November 24, 2009, agents rushed to the FFL to surveil Avila and Patino, but arrived too late.  Over the next month and a half, Avila purchased 13 more weapons, each recorded by the ATF in its database within days of the purchase.  Avila bought the weapons recovered at the scene of Agent Terry's murder almost two months after ATF knew he was working with Patino.  Avila's purchases would eventually total fifty two under Fast and Furious.[52]  Patino's purchases would eventually

---

[50] Agent Alt Transcript, at 187-191.

[51] In re: Manual Osorio-Arellanes, No. 10-10251M, aff. of [Name Redacted], Special Agent, (D.Ariz. Dec. 29, 2010).

[52] Chart of "Indicted targets", [Author Redacted], A/GS Phoenix FIG, (Mar. 29, 2011).

top 660.  As with all the Fast and Furious suspects, gun dealers provided contemporaneous notice of each sale to the ATF.[53]

The day after the Terry shooting, law enforcement agents located and arrested Avila in Phoenix.  The U.S. Attorney's Office in Arizona later indicted him.  Avila's indictment, however, is typical of the indictments that have resulted thus far from Fast and Furious.  Avila was indicted on three counts of "lying and buying"—including false statements on ATF Form 4473, a prerequisite to the purchase of any firearm.  These three indictments, however, do not stem from the weapons purchased on January 16, 2010, that eventually ended up at the Terry murder scene.  Instead, Avila was indicted with respect to rifles he bought *six months later* and which also turned up at a crime scene.

On May 6, 2011, DOJ unsealed an indictment of Manuel Osorio-Arellanes for the murder of Brian Terry.[54]  Federal authorities, led by the FBI, are pursuing his co-conspirators, including the gunman suspected of firing the fatal shot and fleeing the scene.

In Phoenix, the news of Agent Terry's death deeply saddened, but did not surprise, Group VII agents.  They had agonized over the possibility of this event, and they ruefully contemplated future similar incidents resulting from the abundance of illegal guns.

During their transcribed interviews, the ATF agents shared their reactions to Agent Brian Terry's murder.  Agent Dodson testified:

> Q.  Along those lines, when did you find out that Agent Terry was killed?
>
> A.  I found out December 16th, 2010.
>
> Q.  And what can you tell us about your recollections that information?
>
> * * *
>
> A.  Well, I was called by another agent and was told that – or asked if I had heard about Agent Terry's death.  I told him that I had.  And then he confirmed for me what I already thought when he called, which was that it was one of the guns from Fast and Furious.
>
> And then later that day, I was speaking to my acting supervisor, Marge Zicha, and she had made a comment to me that they were very busy because two of the Fast and Furious guns were found at the scene of Agent Terry's homicide.[55]

---

[53] *Id.*
[54] U.S. v. Manuel Osorio-Arellanes et al., No. CR-11-0150-TUC-DCB-JCG. (D.Ariz. Apr. 20, 2011).
[55] Agent Dodson Transcript, at 136-137.

Agent Dodson also detailed ATF's awareness of and its multiple contacts with the accused murderer, Jaime Avila, for months prior to Agent Terry's murder.

> So essentially in January 2010, or December when I got there, **we knew Jaime Avila was a straw purchaser**, had him identified as a known straw purchaser supplying weapons to the cartel. Shortly thereafter, we had previous weapons recovered from Mexico with very short time to crime rates purchased by Jaime Avila, as I recall.

> And then in May we had a recovery where Border Patrol encounters an armed group of bandits and recovered an AK variant rifle purchased by Jaime Avila, and we still did not – **purchased during the time we were watching Jaime Avila, had him under surveillance, *and we did nothing*.**

> Then on December 14th, 2010 Agent Brian Terry is killed in Rio Rico, Arizona. Two weapons recovered from the scene . . . two AK variant weapons purchased by Jaime Avila on January 16th, 2010 while we had him under surveillance, after we knew him to be a straw purchaser, after we identified him as purchasing firearms for a known Mexican drug cartel.[56]

Although the ATF agents' worst fears were confirmed, they did not feel good about being right. In the wake of Agent Terry's death, they were even more upset, saddened, and embarrassed. Agent Alt explained:

> I have loved working for ATF since I have been hired here. I came here to retire from ATF. I could be doing any number of things, as you all are aware. . . . I could be whatever I chose to be, and I chose to be here.

> I am not -- I am embarrassed here. I regret the day that I set foot into this field division because of some of the things that a few people have done and the impact that it has had on our agency, and not the least of, not the least, though, is the impact it has had on the public and safety and Agent Terry. While I don't know that guns in any of these cases are directly responsible for his death, I am appalled that there would be in any way associated with his death.[57]

A December 15, 2010 e-mail exchange among ATF agents details the aftermath of Agent Terry's death. ATF, fearing the worst, conducted an "urgent firearms trace" of the firearms, recovered on the afternoon of the murder. By 7:45 p.m. that evening, the trace confirmed these fears:

---

[56] Agent Dodson Transcript, at 140-141.
[57] Agent Alt Transcript, at 180-181.

> **From:**
> **To:**
> **Cc:**
> **Sent:** Wed Dec 15 19:45:03 2010
> **Subject:** U.S. Border Patrol Agent killed in the line of duty - Two firearms recovered by ATF
> The two firearms recovered by ATF this afternoon near Rio Rico, Arizona, in conjunction with the
> shooting death of U.S. Border Patrol agent Terry were identified as 'Suspect Guns' in the Fast and
> Furious investigation
>
> The firearms are identified as follows:
>
> Romarm/CUGIR, 762 rifle, Model GP WASR 10/63, serial number 1971CZ3775
> Romarm/CUGIR, 762 rifle, Model GP WASR 10/63, serial number 1983AH3977
>
> contact me late this afternoon requesting Intel assistance in the tracing of two recovered
> firearms.
>
> I initiated an urgent firearms trace requests on both of the firearms and then contacted the NTC to
> ensure the traces were conducted today.
>
> I was advised by the NTC that the firearms were entered into ATF Suspect Gun database by SA
> Medina and associated to the Fast and Furious investigation. The NTC further advised that on
> 01/16/10 Jaime AVILA purchased three Romarm 7.62 rifles from Lone Wolf Trading Company, two
> of these firearms are the recovered firearms cited above.
>
> No trace has been submitted on the third firearm purchased by AVILA (serial number 1979IS1530). I
> am researching the trace status of the firearms recovered earlier today by the FBI.

Agent Terry did not die in vain. His passing exposed the practice of knowingly allowing the transfer of guns to suspected straw purchasers. ATF now maintains it no longer condones this dangerous technique. The cessation of this practice will likely save lives on both sides of the border. Tragically, however, we will be seeing the ramifications of the policy to allow guns from Fast and Furious be transferred into the hands of suspected criminals for years to come. These weapons will continue to be found at crime scenes in the United States and Mexico.

## X.   The Beginning of DOJ's Denials: "Hell, No!"

**FINDING:**   **Phoenix ATF Special Agent in Charge (SAC) William Newell's statement that the indictments represent the take-down of a firearms trafficking ring from top to bottom, and his statement that ATF never allowed guns to walk are incredible, false, and a source of much frustration to the agents.**

On January 25, 2011, Phoenix SAC William Newell gave a press conference announcing the indictment of 20 individuals as a result of Fast and Furious. Most of the indictment involves "lying and buying" – paper transgressions that carry much lighter sentences than felonies relating

to actual firearms trafficking.  Under "lying and buying," a straw purchaser improperly fills out ATF Form 4473, required before the purchase of any firearm, by submitting false information. A comparison of the indictment with the goals of Fast and Furious reveals the Operation's utter failure.  According to the agents, the Department could have indicted all 20 defendants far sooner than January 2011.  Instead, the timing of the indictment appears to coincide with the outrage following the killing of Border Agent Brian Terry.  Agent Dodson testified:

> A.   Essentially, the indictments looked very similar in January 2011, when they were finally served, as they did in December 2009 when I first got here.  The only difference is the number of purchases that were made.  Some of the names of people are new, some have been added and some taken out, but no major players at all.

> Q.   So the publicly announced indictments, they are all for straw purchasers, right?

> A.   Yes, sir, which we could have rounded up . . . a year and a half ago.

> Q.   You could have arrested them the day you saw this stuff happening?

> A.   And saved those 1730 guns from being trafficked.[58]

At the press conference announcing the indictments, SAC Newell made two notable comments.  Newell claimed that the indictments represented a take-down of a firearms trafficking ring from top to bottom.[59]  Yet virtually all of the indicted defendants were mere straw purchasers—not key players of a criminal syndicate by any stretch of the imagination.

Newell's second notable comment was equally negligent and inaccurate.  When asked whether or not ATF ever allowed guns to walk, Newell emphatically exclaimed **"Hell, no!"**[60] His denial was shocking to those who knew the truth, like Agent Alt:

> Q.   And why is that engrained in your memory?

> A.   Candidly, my mouth fell open.  I was asked later by the public information officer for our division  . . .  and I told him that I thought that – I was just astounded that he made that statement and it struck me and I don't know how he could make that statement.[61]

* * *

---

[58] Agent Dodson Transcript, at 141-142.
[59] Tamara Audi, *Alleged Gun Ring Busted,* W.S.J., Jan. 26, 2011.
[60] Dennis Wagner, *Sen. Chuck Grassley: Guns in ATF sting tied to agent's death*, TUCSON CITIZEN, Feb. 1, 2011.
[61] Agent Alt Transcript, at 193-194.

Q.     When SAC Newell made those statements at the press conference and you
       said something along the lines – did your jaw drop?

A.     Literally my mouth fell open.  I am not being figurative about that.  I
       couldn't believe it.

Q.     Is it fair to say that his statements that caused your mouth to drop, that's a
       spectacular lie, isn't it?

A.     Yes.  My mouth fell open because I thought, I perceived it as being either
       completely ignorant or untruthful.  But also a person in that position I
       don't really – I don't know that I would have made – the statement was
       unnecessary to make.  He did not need to make the statement.

       If I am in a position like that and I have gotten involved or have
       knowledge of an investigation, me personally, I probably would have
       avoided comment.  I certainly would have avoided making a comment like
       that.[62]

Agent Casa also expressed similar astonishment at Newell's inaccurate comment
following the press conference:

Q.     At the press conference I believe he was asked whether or not guns
       were walked, and his response was hell no.  Do you remember
       that?

A.     Yes, I do.

Q.     What was your reaction to that statement?

A.     I can't believe he just answered the question that way.

Q.     And why can't you believe that?

A.     Because we, in my definition of walking guns, we had walked a
       bunch of guns.  When I say we, Group 7.  And under this case that
       we are discussing, a bunch of firearms were walked against the
       objections o f some senior agents.

       Q.     So Newell's statement was inaccurate?

       A.     I would say it was very inaccurate.[63]

---

[62] Agent Alt Transcript, at 202-203.
[63] Agent Casa Transcript, at 119-120.

Agent Forcelli shared similar sentiments over Newell's remarkable statements during the press conference.

> Q.    Right.  Did you attend that press conference that SAC Newell
>       came down to do, or did?
>
> A.    No.  I was involved in the command post that day.  I wasn't there.
>       I heard about it.  I was appalled.
>
> Q.    Tell us about your reaction.  What were you appalled by?
>
> A.    My understanding is somebody asked him if guns walked, and his
>       response was hell no.
>
> Q.    How did you feel about that?
>
> A.    Insulted.  Because I know that they were saying that this was a
>       technique that was like a great new technique we were using. . . .
>       And it just amazes me.  But he knew what was going on.  He is the
>       SAC.  And agents knew that guns were not being interdicted.[64]

None of the agents interviewed believed Newell's dramatic comment to be truthful.  His denial of the existing policy sought to end questioning on this topic once and for all.  Instead, it only engendered more attention and interest.


## XI.   DOJ's Continued Denials: "That is False."

> FINDING:    **Despite mounting evidence to the contrary, DOJ continues to deny
>             that Operation Fast and Furious was ill-conceived and had deadly
>             consequences.**

The denials of gunwalking became more sensational as they continued.  Presented with an opportunity to set the record straight, the Department of Justice instead chose a path of denial.


## A.   "Of Course Not"

In a February 4, 2011 letter to Senator Charles Grassley, Ranking Member of the Senate Judiciary Committee, DOJ's Assistant Attorney General for Legislative Affairs wrote:

> At the outset, the allegation described in your January 27 letter – that ATF
> "sanctioned" or otherwise knowingly allowed the sale of assault weapons
> to a straw purchaser who then transported them into Mexico – **is false.**

---

[64] Agent Forcelli Transcript, at 52-53.

ATF makes every effort to interdict weapons that have been purchased illegally and prevent their transportation to Mexico.[65]

When asked in later meetings and letters how this statement could be true in light of all the evidence to the contrary, DOJ officially stood by it. The argument that it is true relies on the fine distinction that it was not the *straw purchasers themselves* who physically crossed the border with the weapons, but rather the unknown third parties to whom they transferred the firearms. DOJ offered no specific defense of the second sentence.

Of course, this statement misses the point entirely. ATF permitted known straw purchasers to obtain these deadly weapons and traffic them to third parties. Then, at some point after ATF broke off surveillance, the weapons were transported to Mexico. ATF was definitely aware that these guns were ending up in Mexico, being transported through Arizona and Texas Points of Entry.[66]

The second part of this statement is also patently false. Numerous ATF agents have gone on the record with stories that directly contradict it. During interviews with, these agents had the chance to respond directly to DOJ's position. Not surprisingly, they uniformly rejected it. Agent Alt testified:

> Q.    And I will just read a portion of that into the record. The second paragraph of the letter said, the second sentence of the second paragraph says, "ATF makes every effort to interdict weapons that have been purchased illegally and prevent their transportation to Mexico," period. Is that sentence, based on your knowledge of what was going on here in Phoenix, true or not true?
>
> A.    **No, it is not true.**[67]

Agent Forcelli agreed:

> Q.    [The] second sentence of the second paragraph of the letter says: "ATF makes every effort to interdict weapons that have been purchased illegally to prevent their transportation to Mexico," period. Have you heard that before, that that representation was made to Congress?
>
> A.    I was unaware of that. And I will tell you based on what I know has occurred that *that is false.*[68]

Agent Forcelli reiterated, "Based on my conversations in regards to that meeting between Mr. Hurley and the ATF's agents and the two gun dealers, no. *It is false.*"[69] And when asked if

---

[65] Letter from Assistant Attorney General Ronald Weich to Senator Charles E. Grassley (Feb. 4, 2011) (emphasis added).

[66] The Fast and The Furious, Organized Crime Drug Enforcement Task Force Interim Report (Sept. 9, 2010).

[67] Agent Alt Transcript, at 148.

[68] Agent Forcelli Transcript, at 143-144.

the DOJ's statement was true, given what he had personally witnessed in Phoenix, Agent Casa replied, "I think you already know the answer to that. *Of course not.*"[70]

## B.    More Denials

Even after the U.S. Congress presented it with evidence that the statements in the February 4, 2011 letter were false, the Department of Justice *still* stood by its initial position. In a May 2, 2011 response to a letter from Senator Grassley, the Department maintained its original position:

> It remains our understanding that ATF's Operation Fast and Furious did not knowingly permit *straw buyers* to take guns into Mexico. You have provided to us documents, including internal ATF emails, which you believe support your allegation. . . . [W]e have referred these documents and all correspondence and materials received from you related to Operation Fast and Furious to the Acting Inspector General, so that she may conduct a thorough review and resolve your allegations.[71]

The Justice Department also notes that the Attorney General has "made clear . . . that the Department should never knowingly permit firearms to cross the border." Although the Department issued this directive in early-March, well after the congressional investigation of Operation Fast and Furious had begun, it is a welcome affirmation of what the ATF whistleblowers had been trying to tell their bosses for over a year before Agent Brian Terry was killed.

# XII.  Conclusion

We will persist in seeking documents and testimony from Justice Department officials and other sources to thoroughly examine all the key questions. The Department should avail itself of the opportunity to come clean and provide complete answers. It should also reverse its position and choose to fully cooperate with the investigation.

---

[69] Agent Forcelli Transcript, at 144.
[70] Agent Casa Transcript, at 131.
[71] Letter from Assistant Attorney General Ronald Weich to Charles E. Grassley (May 2, 2011).